## John A. Lyons, Appellee, v. Chicago City Railway Company, Appellant.

### Gen. No. 17,029.

1. STREET RAILROADS—*injury by snowplow.* Where a street railway company on a stormy night ran an ordinary passenger car with a snowplow attachment eight inches high, which was wholly or partially concealed by snow and projected eight or nine feet into the street from the center of the car, the jury were justified in giving a verdict for the plaintiff, who was a prospective passenger injured by such projection, where its employes in charge of the car did not stop the same but merely shouted when they saw the plaintiff approaching.

2. INSTRUCTIONS—*when not reversible error.* An instruction objectionable in itself but not so when considered in connection with other instructions does not constitute reversible error where the jury are instructed that all the instructions should be considered together.

3. INSTRUCTIONS—*that plaintiff need prove case only by preponderance of evidence, proper.* An instruction in a personal injury case that the plaintiff is not bound to prove his case beyond a reasonable doubt but only bound to prove it by a preponderance of the evidence, is proper.

4. DAMAGES—*when excessive in a personal injury suit.* Seven thousand dollars damages awarded a doctor because of a fall resulting in a fractured collar bone, slight nervousness and slight impairment of eyesight and hearing, the evidence on the latter being conflicting, is excessive.

Appeal from the Circuit Court of Cook county; the Hon. JOHN GIBBONS, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1910. Affirmed on remittitur otherwise reversed and remanded. Opinion filed June 14, 1912.

S. S. PAGE and C. LEROY BROWN, for appellant; LEONARD A. BUSBY, of counsel.

JAMES C. McSHANE, for appellee.

MR. PRESIDING JUSTICE BALDWIN delivered the opinion of the court.

Upon this appeal we are asked to reverse a judg-

ment for $7,000 rendered against appellant, the Chicago City Railway Company, in the Circuit Court of Cook county, in favor of appellee, John A. Lyons, for personal injuries received by him on February 1, 1908, through the alleged negligence of appellant.

A reversal is sought upon the following contentions:

First.    The verdict is not sustained by the preponderance of the evidence.

Second.    The court erred in instructing the jury.

Third.    The damages are grossly excessive.

Fourth.    The court erred in rulings on the admission of evidence.

It appears that appellee was, at the time of the accident, a practicing physician, about fifty-four years of age.    About eight o'clock in the evening, having just made a professional call at some point on Sixty-eighth street, near Calumet avenue, he walked south on the west side of Calumet avenue to Sixty-ninth street, intending to board a westbound car thereon.    There were five or six inches of snow upon the ground, and it was, at the time, snowing and blowing.    For the purpose of clearing off the snow, appellant had attached a snow-plow rigging to one of its old-fashioned, ordinary, short passenger cars, and was running it west on the north side of Sixty-eighth street.    The snow-plow attached consisted of a plank about fifteen feet long and eighteen inches wide, the forward end of which was fastened to the front end of the front trucks on the right-hand or north side of the car as it was going west, and extending outward and backward at such an angle that the other end was extended out about eight or nine feet from the north rail; an iron bar connected the middle of the plank with the rear trucks and served as a brace.    The purpose of the plow was to brush the snow back from the rails far enough to leave a clear space for passengers to alight and for teams to turn out of the track.

There were four employes of appellant company

with the car, which was being operated westwardly at a rate of about five miles an hour between blocks—the motorman, Dutton, running the car; the conductor, Lageschult, who was on the front platform with the motorman, and whose duty it was to warn persons that got in the way of the plow or attempted to board the car upon the front platform; another man, Hall, standing with his feet on the snow-plow arrangement, and holding to the side of the car, stationed there for the purpose of warning persons who might step into danger, and one Curran on the rear platform, to keep intending passengers from boarding, and also to warn drivers and others approaching from the rear. At times the entire crew was necessary to change the snow-plow attachment from one side of the car to the other when reaching the end of a line, or otherwise switching back.

Appellee mistook the car to which this snow-plow rigging was attached for one of the regular cars in the passenger service, and stepped out into the way of the projecting plank, by which he was struck and thrown, or caused to fall over, receiving the injuries complained of.

As to the circumstances immediately preceding the actual contact between appellee and the snow-plow rigging, the testimony is directly conflicting. That on behalf of appellant tends to show that the car was approaching from the east at a slow rate of speed, averaging about five miles per hour between blocks; that, as the car approached Calumet avenue from the east, it was throwing out the snow to the west and northwest, nearly to the curb; that, as they approached the crossing of Calumet avenue and Sixty-ninth street, appellee was seen coming from the north on the west side of Calumet avenue, and observed till he reached the north side of Sixty-ninth street, where he hesitated; that, assuming he was mistaken in supposing it was a passenger car and desired to board it, the motor-

man slowed up the car on the east side of the street so as to see what he intended to do—whether to cross the street or to stand out between the rail and the sidewalk, so as to board the car. It is claimed that at this time the motorman hit the bell three or four taps and "hollered" at appellee that he should look out; that he seemed to hesitate a moment, whereupon, thinking he was going to remain where he was, the car was moved along; that when the front end of the car was about even with the west cross-walk the motorman says he heard his partner (Lageschult, the conductor) yell at appellee, and that at about the same time Hall "hollered" as appellee approached the moving car from the sidewalk; that the car was stopped just after the big wing, or plank, reached the doctor. In short, that, when the car reached the east side of Calumet avenue, it was slowed down almost to a stop; that the employes on the car shouted to appellee, who was evidently going toward the south on the west side of Calumet avenue, and that he stopped or hesitated and looked at the car for an instant, whereupon the car started forward, and when it was within about ten feet of the cross-walk, appellee stepped from the sidewalk into the roadway. There were no passengers upon the car, which was then being used only to propel the snow-plow and clear the track. When appellee stopped, or hesitated, and looked south right toward the car, which was just pulling up to the west cross-walk, it was about two-thirds of the way across Calumet avenue. The conductor, Lageschult, testified that when the car left the east side of the street, appellee was on a fast walk toward the car. Hall, the man who stood upon the wing, or brace-rod of the snow-plow, testified that he saw appellee coming south as far as the corner, and that he stood still an instant, and that the car was stopped at that moment before crossing Calumet avenue, and when the car was started up appellee made for the rear of it, and tumbled over the

wing of the snow-plow. Curran, who was on the rear platform, testified that when he first saw appellee he had started forward, whereupon Curran shouted to him to stay back. Curran further testified that if appellee had remained where he was at that instant he would have been clear of the board.

The testimony on behalf of appellee tends to show that when he approached the intersection of Sixty-ninth street and Calumet avenue from the north, he stopped upon the sidewalk on the northwest corner, at which there was a lighted street lamp; that he intended to take a westbound car, but there was none in sight; that he stood there two or three minutes waiting; that he observed the car coming from the east when it was about two blocks away; that when it was about 150 feet away he started south in Sixty-ninth street toward the westbound track; that passengers got on the north side of the westbound car; that the car had the appearance of an ordinary street car as it came up to him, and there was nothing about it, either as to noise or appearance, to indicate to the contrary; that he went out six or eight feet from the curb, which brought him within four or five feet of the car, where he waved his hand for the car to stop; that he did not discover that it was not an ordinary street car until the front part of the car was opposite him, at which time he saw the man standing on the side of the car, or the plank, whose head was at the time inside the car through an open window. After seeing him the doctor noticed that he was standing upon a board, and as soon as he saw that he attempted to get out of the way by jumping; that the plank extended north from the car six to nine feet. Appellee further testified that no one said anything to him nor gave him any warning, nor was there any ringing of the bell before the board struck him; that he had nothing over his ears; that he had never before seen any snow-plow appliance of that kind; that he looked toward the car when it was on

the east side of the street coming toward him, and did not at any time see the snow spraying or sliding out of the way; that he heard no shout or call of any sort.

It appears from the testimony of several witnesses that at the time it was snowing and blowing quite hard, and that the car in question was one of the small four-wheeled street cars then used for passenger service by the street car company, having a headlight like an ordinary street car—nothing about it, either as to noise or looks to indicate that it was anything different than an ordinary street car.

It is quite true, as contended by appellant, that this court has the final determination of the weight of evidence, and should reverse a judgment where the verdict is clearly and manifestly against the weight of the evidence, and it is also true that the party holding the burden of proof must establish his case by a preponderance of the evidence, and that the number of witnesses upon either side is an element in determining where the preponderance lies; but it is also true that in determining upon which side the preponderance of the evidence lies, neither the jury nor this court is concluded merely by the number of witnesses. It is also true that ordinarily the uncorroborated testimony of an interested party will be held insufficient to sustain a verdict where his evidence is contradicted by the testimony of two or more unimpeached witnesses having equal opportunity for knowing the facts. In the case at bar, however, we do not think the application of these principles would justify us in reversing the judgment.

We are of the opinion that upon the facts disclosed by the testimony of the witnesses for both sides, appellant company was guilty of actionable negligence. It is a matter of common knowledge that persons habitually served by the street cars are accustomed to approach a position from which they may quickly enter the car when it actually reaches them. Appellant was

operating the car in question with knowledge that in order to render quick service and handle as many passengers as possible, it required of prospective passengers that they get into position to enter the car quickly, and that appellee might be expected to approach and attempt to enter the car, as apparently he did. The night in question was blustering and windy; the ground was covered with five or six inches of snow, and snow was blowing through the air. There was nothing about the appearance of the car to in any way distinguish it from an ordinary street car upon which passengers might enter.

Appellee's version of the affair down to the time he was struck seems entirely reasonable. There was nothing to put him upon notice that the car was dragging a snow-plow, projecting eight or nine feet out from its side, so that he would be in danger of being struck at almost any point between the north track and the curb; indeed, we think the testimony of the witnesses for the defendant company tends to show negligence in the management of this car. According to their own story, there was nothing about the car to attract attention or to suggest its unusual use as merely a motive power for the snow-plow, which, itself, was concealed by the snow it was pushing back. They saw appellee approaching and testified that he acted as if he intended to board the car as a passenger. It is true they testified that they shouted at him both when the car was on the east side of the crossing and again just before he was struck, but we do not think that was sufficient to relieve the company from the charge of negligence. When it used an appliance which extended out almost entirely across the north half of the street, and was wholly or partially concealed by the snow, and when those in its charge discovered a prospective passenger approaching, it was not sufficient merely to shout at him; when they saw that he had stepped down into the street and was in a

position of danger, the car should have been stopped. We think that the jury were justified in finding that appellant was negligent, and that the verdict therefor was not against the manifest weight of the evidence.

It is strongly urged that the court erred in the matter of instructions, and particularly that the court erred in giving, at the request of plaintiff, the following instruction:

"36.    The preponderance of evidence in a case is not alone determined by the number of witnesses testifying to a particular fact or state of facts.    In determining upon which side the preponderance of evidence is, the jury should also take into consideration, so far as shown by the evidence, the opportunities of the several witnesses for seeing or knowing the things about which they testify; their conduct and demeanor while testifying, their interest or lack of interest, if any, in the result of the suit; the probability or improbability of the truth of their several statements in view of all the evidence, facts and circumstances proved on the trial; and from all these circumstances and a full consideration of all the evidence, determine upon which side is the greater weight or preponderance of the evidence."

In determining whether or not the giving of this instruction constituted reversible error we must consider the other instructions in the case.    The very first one was to the effect that the instructions constituted one connected body and series, and should be so regarded and treated by the jury; that is to say, they should apply them as a whole to the facts, and not detach or separate any one instruction from any or either of the others.    Instruction No. 31, given by the court, at the request of appellant, was as follows:

"31.    The jury are further instructed that while the preponderance of evidence does not consist solely in the greater number of witnesses testifying the one way or the other, yet the number of credible witnesses

testifying on the one side or the other of a disputed point is proper for the jury to consider in determining where lies the preponderance of the evidence.''

We have carefully considered the cases cited by appellant in support of its contention that the giving of appellee's instruction No. 36 constituted reversible error, but we think that when this instruction is read in connection with No. 1 and No. 31, given at the instance of appellant, that no substantial error was committed. If the jury read the complained-of instruction (No. 36) in connection with No. 31, as it should have done, and it must be presumed it did do, it would have been impossible for them not to understand that the question of numbers should be considered by them in determining where the preponderance of the evidence lay.

It is objected that instruction No. 36 has a tendency to make the jury think the element of the number of witnesses of little or no consequence. We do not think so. The instruction declared that the preponderance of evidence in a case is not alone determined by the number of witnesses testifying to a particular fact or state of facts, but that in determining upon which side the preponderance of evidence is, the jury should "*also*" take into consideration not only the number of witnesses, but, so far as shown by the evidence, their several opportunities for seeing or knowing things about which they testify—their conduct, demeanor, etc., and, from all these circumstances, *and a full consideration of all the evidence,* the preponderance is to be determined.

It is further contended that the court erred in giving, at the request of appellee, instruction No. 15, which was as follows:

"15. The jury are instructed that the plaintiff is not bound to prove his case beyond a reasonable doubt, but is merely to prove it by a preponderance of the evidence.''

With respect to this identical instruction, this court, in Gurnea v. Baltimore & Ohio R. R. Co., 157 Ill. App. 331, said:

"The giving of this instruction is assigned for error. In view of what the Supreme Court has said regarding this instruction in Chicago City Ry. Co. v. Nelson, 215 Ill. 436; Consolidated Traction Co. v. Schritter, 222 Ill. 364; C. U. T. Co. v. Mee, 218 Ill. 9, and other cases, we cannot hold the instruction erroneous."

In the Nelson case, *supra,* the Supreme Court, referring to this particular objection to the instruction, said:

"It is next insisted that the court erred in giving the fourth and eighth instructions on behalf of appellee. These instructions told the jury that plaintiff is not bound to prove his case beyond a reasonable doubt, but is only bound to prove it by a preponderance of the evidence, and if the jury find that the evidence bearing upon plaintiff's case preponderates in his favor, although but slightly, it would be sufficient to justify a finding of the issues in his favor. It is insisted that the use of the term 'plaintiff's case' and authorizing a verdict for plaintiff if he proves 'his case' was erroneous, for the reason that the words were not qualified by any reference to the allegations of the declaration. We do not regard the objection of substantial merit. (North Chicago St. R. R. Co. v. Polkey, 203 Ill. 225.)"

We have carefully considered the briefs and arguments with respect to alleged error on the part of the court below in its rulings upon the admission of evidence, and do not find any adequate justification for a reversal of the judgment upon that ground.

It is further complained that the damages awarded by the jury are grossly excessive, and, after painstaking examination of the testimony, we have reached the conclusion that the amount of damages awarded by the jury is too great. The contact between appellee and the plank was evidently not very violent. It clearly

appears that immediately after his fall, the employes of appellant assisted him to rise, and asked him whether he needed help or medical attention, to which he replied that he did not. He walked without assistance to a drug store in the next block, where he remained five or ten minutes, but received no medical attention. Thereafter he boarded a street car and made a number of visits to patients, during which he occupied about an hour and a half, and transferred a number of times from one street car to another. He then telephoned his friend, Dr. Ferguson, and at his suggestion went to the hospital, where he remained four days, after which he went home. While making the calls mentioned he noticed a trembling of his body, which had practically disappeared when he left the hospital.

Appellee testified that he resumed work within two weeks from the date of the accident and continued it ever since. His injury was a fracture of the collar bone, which he himself describes as being a "simple transverse fracture, * * * the simplest in its nature, and one of those that is in the least harmful." The collar bone had united with a fibrous union, which appellee's physician testified, made a good, useful arm. Dr. Ferguson also testified that in about three days after the accident the left eye-ball became bloodshot, and there was some swelling behind the left ear, which he thought due "to a local bruise—just a local direct injury." Appellee claimed that in addition to the fracture of the collar bone there was a fracture of the malleus, one of the small bones of the ear, resulting in deafness of his left ear, also pain and impairment in the sight of his left eye, and a possible fracture of the orbital plate of the skull; and, as a result of some or all of these, considerable nervousness.

As to his deafness in one ear, it appears that the accident occurred February 1, 1908. Dr. Allport, who testified in his behalf, examined him on the 8th of

April, a little over two months after the accident, and again in January, 1910. Dr. Allport testified that one of the small bones of the left ear, the malleus, was broken, but that nothing was the matter with the drum of the ear, although there was some inflammation. He could not say whether the inflammation, which resulted in the thickening of the drum-head, was catarrhal in character or not, though a catarrhal condition of the ear often thickened the ear drum; and he further testified that he could not tell how long these conditions, which he found, had been in existence. Appellee himself testified that the hearing in his left ear had been defective for ten years before the accident, and that the trouble came on insidiously, without his knowledge. He thinks that, though he had tested his ear during the interval, and the ear did not seem to be much worse, yet he admits that he had made no test within, perhaps, three or four years, and did not know what difference there was in his hearing during that period. There was evidently no breaking of the membrane, nor was the injury attended with any discharge of blood from the ear, nor did his alleged deafness in the ear become apparent immediately. It further appears that appellee had at the time of the accident two accident insurance policies, which he subsequently adjusted with the companies, and to neither of the physicians representing these companies did he make any serious complaint or claim on account of his hearing having been affected by the accident, though the policies provided for partial as well as for total disability.

Concerning the alleged injury to his eye, appellee, himself a practicing physician, and an intimate associate with capable men in his profession, never consulted any physician or oculist on account of the condition of his eye after the accident, nor did he have his eyes tested in any manner, but he continued to wear glasses which he had originally bought in a department store. It was significant also that when he

was examined by Dr. Allport, a prominent eye specialist, with reference to the injury to his ear, appellee did not suggest any difficulty with his eyes, or, in any event, did not have them examined.

The testimony as to appellee's alleged nervousness after the accident, except during his four days in the hospital, is confined to that of appellee himself, and one Dr. Baer, whose specialty was giving "electrical treatments," and is far from satisfactory. Indeed, appellee admitted that he had never been examined by any nerve specialist.

We think the evidence fails to show that the alleged loss of earnings on the part of appellee was due to the accident. He continued in the practice of medicine in the same neighborhood, and testified to having been busy after the accident. In view of all the testimony in the case, we regard the verdict as excessive. Accordingly, unless appellee shall, within five days remit $2,500.00, the judgment will be reversed and the cause remanded; should this amount be remitted the judgment will be affirmed.

*Affirmed on remittitur; otherwise reversed and remanded.*